## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNIVERSITY OF CINCINNATI CHAPTER OF YOUNG AMERICANS FOR LIBERTY, *et al.*, | : | Case No.  1:12-CV-155 |
| | : | |
| | : | Judge Black |
| Plaintiffs, | : | |
| | : | |
| -vs- | : | |
| | : | |
| UNIVERSITY OF CINCINNATI, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT

As the Supreme Court has made clear in decisions dating back decades, preserving freedom of expression on public university campuses is of particular importance for the health of our democracy.[1]  Pursuant to this principle, Plaintiffs University of Cincinnati Student Chapter of Young Americans for Liberty ("YAL") and UC student Christopher Morbitzer and hereby move, pursuant to Federal Rule of Civil Procedure 65(b), for issuance of a temporary restraining order and preliminary injunction enjoining enforcement of the unconstitutional policy, practice and custom of the Defendants, together with the action of the Defendants which serve to enforce said policy, practice and custom.  Through vague and ambiguous policies, Defendants have relegated Plaintiffs (and their supporters) to a confined and limited area which, due to its location and restrictions, undermines and frustrates any opportunity for the meaningful exercise of one's

---

[1]      *See Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("[t]he essentiality of freedom in the community of American universities is almost self-evident.… Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die"); *see also Healy v. James*, 408 U.S. 169, 180 (1972) (noting that "[t]he college classroom with its surrounding environs is peculiarly the marketplace of ideas") (internal quotation marks omitted).

First Amendment rights on the campus of the University of Cincinnati ("UC" or the "University").

If Defendants' policy, practice and custom prohibiting or restricting UC students ability to fully engage in the exercise of the First Amendment rights are not immediately enjoined, Mr. Morbitzer and YAL and its student-members (as well as others) will suffer and will continue to suffer irreparable harm for which there is no adequate remedy at law.  Pursuant to Local Rule 7.2(a)(1), this Motion is accompanied by a Memorandum in Support.

Plaintiffs request that the requirement to give security pursuant to Rule 65(c) be waived.

| | Respectfully submitted, |
|---|---|
| | _/s/ Ryan D. Walters_____ |
| | Ryan D. Walters (0076724) |
| | *Trial Attorney for Plaintiffs* |
| Curt C. Hartman (0064242) | Maurice A. Thompson (0078548) |
| *Co-counsel for Plaintiffs* | 1851 Center for Constitutional Law |
| The Law Firm of Curt C. Hartman | 208 E. State Street |
| 3749 Fox Point Court | Columbus, Ohio 43215 |
| Amelia, Ohio 45102 | Tel: (614) 340-9817 |
| Tel: (513) 752-8800 | Fax: (614) 365-9564 |
| hartmanlawfirm@fuse.net | rwalters@ohioconstitution.org |
| | mthompson@ohioconstitution.org |

**TABLE OF CONTENTS
AND SUMMARY OF MEMORANDUM IN SUPPORT**

I.  INTRODUCTION …………...………………………………………...…..…1

Primary Authorities:
*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453 (6th Cir. 1997)
*United Food v. Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Trans. Auth*, 163 F. 3d 341 (6th Cir. 1998)

II. BACKGROUND………………………………………………..………………3
    A. Plaintiffs' Expressive Activity ……………………………………….....3
    B. The University of Cincinnati's Prohibition of Free Speech
       on Public Property ……………………………………………………..4
    C. UC's Application of the Policy to Mr. Morbitzer and YAL ……………....5

III.LAW AND ARGUMENT ……………………………………………...……..6

Summary of Argument:
*Plaintiffs satisfy the elements necessary for issuance of a temporary restraining order and preliminary injunction enjoining enforcement of Defendants' policies, practices and customs of restricting certain expressive activities of students to a limited outdoor area on campus and with onerous permit and notice requirements*

    A. Mr. Morbitzer and YAL are likely to succeed on the merits …………………6

Primary Authorities:
*Cornelius v. NAACP Legal Defense & Educ., Fund, Inc.,* 473 U.S. 788 (1985)

        1. Gathering signatures for a statewide constitutional amendment is
           protected speech …………………………………………………….…7

Primary Authorities:
*Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005)
*Meyer v. Grant,* 486 U.S. 414 (1988)

        2. Public sidewalks, streets, thoroughfares, grassy spaces, plazas, and other
           open spaces on the University of Cincinnati campus are public fora ……8

Primary Authorities:
*Widmar v. Vincent*, 454 U.S. 263 (1981)
*Roberts v. Haragan*, 346 F. Supp. 2d 853 (N.D. Tex. 2004)

i

*United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449 (6th Cir. 2004)

**3. The University of Cincinnati "Free Speech Area" is a public forum …...10**

Primary Authorities:
*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010)
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37 (1983)
*Bowman v. White*, 444 F.3d 967 (8th Cir. 2006)

**4. Sixth Circuit precedent does not alter the conclusion that UC's public sidewalks, streets, thoroughfares, grassy spaces, plazas, and other open spaces and "Free Speech Area" are public fora. …………………………12**

Primary Authorities:
*Gilles v. Garland*, 281 Fed. Appx. 501 (6th Cir. 2008)
*Justice for All v. Faulkner*, 410 F.3d 760 (5th Cir. 2005)
*Miller v. City of Cincinnati*, 622 F.3d 524 (6th Cir. 2010)

**5. UC's capacity to regulate core political speech in these fora is strictly limited ……………………………………………………………………14**

Primary Authorities:
*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37 (1983)
*United States v. Grace,* 461 U.S. 171 (1983)

**6. The burdens UC imposes on core political speech are not narrowly tailored to serve any significant governmental interest……………………………………………...……………………..14**

Primary Authorities:
*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)
*Frisby v. Schultz*, 487 U.S. 474 (1988)

**a. UC's policy of prohibiting *all* demonstrations, pickets, and rallies outside of the 'Free Speech Area" is not narrowly tailored to prevent "disruption of UC's educational mission." …………………….…...15**

Primary Authorities:
*Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640 (1981)
*Healy v. James*, 408 U.S. 169 (1972)

**b. UC's policies burdening all political speech loosely characterized as demonstrations, pickets, or rallies inside of the "Free Speech Area" are not narrowly tailored to prevent "disruption of UC's educational mission."** ……………………………………………………...18

Primary Authorities:
*Trewhella v. City of Findlay,* 592 F. Supp. 2d 998 (6th Cir. 2008)
*Community for Creative Non-Violence v. Turner*, 893 F.2d 1387 (D.C. Cir. 1990)

**7. The burdens UC imposes on core political speech are unconstitutionally vague**……………………………………………………………………**21**

Primary Authorities:
*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002)
*Grayned v. City of Rockford*, 408 U.S. 104 (1972)
*Gilles v. Garland*, 281 Fed. Appx. 501 (6th Cir. 2008).
*Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004)
*United Food & Commercial Workers Union Local 1099 v. Southwest Ohio Regional Trans. Auth.*, 163 F.3d 341 (6th Cir. 1998

**8. The burdens UC imposes on core political speech are not content neutral**…………………………………………………………………**24**

Primary Authorities:
*Police Dep't of Chicago v. Mosley*, 408 U.S. 92 (1972)
*Meyer v. Grant,* 486 U.S. 414 (1988)

**B. Irreparable Injury** ………………………………………………………..**25**

Primary Authorities:
*Elrod v. Burns*, 427 U.S. 347 (1973)
*Connection Distributing Co. v. Reno*, 154 F.3d 28 (6th Cir. 1998)

**C. Public Interest and Private Harm** ……………………….…………………**26**

Primary Authorities:
*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994)

**IV. CONCLUSION** ……………………………………………..……………………**26**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

Plaintiffs initiated this civil rights action today by filing a Verified Complaint challenging the implementation of the policy, practice and custom of the University of Cincinnati, and its officials, regarding their policies and practices, and the enforcement thereof, whereby Defendants have unconstitutionally prevented and restrained Mr. Morbitzer and Young Americans for Liberty from fully and meaningfully engaging in core political speech with their fellow students on the campus of the University of Cincinnati, as well as Defendants' implementation of a licensing scheme for engaging in such core political speech.  Through vague and ambiguous policies which allow for arbitrary application, Defendants have relegated Plaintiffs (and their supporters) to a confined and limited area which, due to its location and restriction, unconstitutionally undermines and frustrates any opportunity for the meaningful exercise of one's First Amendment rights.

In determining whether to grant the present motion for issuance of a temporary restraining order and preliminary injunction, the Court is to consider four factors:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether the issuance of a temporary restraining order or preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a temporary restraining order or preliminary injunction.[2]  These factors are to be balanced against one another and should not be considered

---

[2]        *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*) (quoting *Sandison v. Michigan High Sch. Athletic Ass'n,* 64 F.3d 1026, 1030 (6th Cir. 1995)); *see also Southwest Williamson County Cmty. Assoc. Inc. v. Slater*, 243 F.3d 270, 277 (6th Cir. 2001).

1

prerequisites to the granting of a temporary restraining order or preliminary injunction.[3]  As developed below, the balance of interests weigh strongly in favor of the Plaintiffs and the granting of the present motion.

First, Plaintiffs are highly likely to succeed on the merits because Defendants' conduct violates well-established First Amendment and Fourteenth Amendment rights.  The prior restraints on core protected speech enforced by Defendants violate the First Amendment. Furthermore, Defendants' policies and practices are unconstitutionally vague, resulting in an impermissible chilling effect as students, like Plaintiffs, choose to self-censor rather than risk university discipline or criminal charges for violating the University's onerous and uncertain policies.

Second, Plaintiffs have suffered and will continue to suffer irreparable injury every day in which they are not permitted to engage in core political speech by the circulation of initiative petitions.  The infringement upon Plaintiffs' speech and advocacy continues to occur due to the implementation and enforcement of Defendants' policies and practices which deliberately and consciously place Plaintiffs in a position whereby they are severely and significantly restricted in their ability to engage in the exercise of their free speech rights.

Third, the requested injunctive relief would not result in any injury to Defendants or to third parties.  Plaintiffs request only the ability to engage in core protected speech in dialogue with their fellow students throughout the open areas of the University's campus and to do so in a way does not disrupt the University's mission.

Finally, the public interest is clearly in favor of injunctive relief.  As the Supreme Court has made clear in decisions dating back decades, preserving freedom of expression on public

---

[3]      *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 347 (6th Cir. 1998).

university campuses is of particular importance for the health of our democracy.[4]  Not only do Plaintiffs believe that permitting their specific expressive activity would benefit the public, but enjoining unconstitutional speech-restrictive policies would maximize political discourse on issues of public concern. Furthermore, it is always in the public interest to prevent the violation of a party's constitutional rights.

## II.    BACKGROUND

### A.  *Plaintiffs' Expressive Activity*

Plaintiff University of Cincinnati Chapter of Young Americans for Liberty ("YAL") is a registered and recognized student group at the University of Cincinnati; Plaintiff Christopher Morbitzer, a student at the University of Cincinnati, is a member and president of YAL. (Complaint ¶¶ 5-7).  YAL seeks to recruit, train, educate and mobilize students on the ideals of liberty and the United States Constitution.   One means by which YAL and Mr. Morbitzer seek to advance those ends are supporting and engaging in initiative petition efforts in order to place freedom-oriented ballot initiatives before Ohio voters.

Currently, YAL and Mr. Morbitzer are involved in an effort to gather signatures in support of the proposed Ohio Workplace Freedom Amendment.  Plaintiffs have sought and continue to seek to (1) gather signatures in the open outdoor public spaces on the campus of the University of Cincinnati; (2) gather these signatures on repeated occasions up until and, if necessary, after[5]

---

[4]    *See Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("[t]he essentiality of freedom in the community of American universities is almost self-evident.… Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die"); *see also Healy v. James*, 408 U.S. 169, 180 (1972) (noting that "[t]he college classroom with its surrounding environs is peculiarly the marketplace of ideas") (internal quotation marks omitted).
[5]    Ohio law allows for a ten-day window in which to gather more signatures if advocates for the Ohio Workplace Freedom Amendment initially all short of their signature goal after the Ohio Secretary of State determines signature validity.  The UC policy would entirely foreclose Plaintiffs' participation in this process on campus.

3

July 9, 2012 for this effort, and then later on future initiative efforts; and (3) gather these signatures when the opportunity to do so arises, without prior permission, much less a ten day waiting period.

This activity is not disruptive: it does not occupy space greater than the size of the students themselves, does not block or impede student traffic, and does not necessarily involve the students raising their voices beyond the decibel level of a typical conversation. Mr. Morbitzer specifically noted in his correspondence with UC: "We will not block access to UC buildings or sidewalks, use amplified sound, impede vehicular or pedestrian traffic, or in any way substantially disrupt the operations of campus or UC's educational functions." (Complaint Exhibit F).

### B. *The University of Cincinnati's Prohibition of Free Speech on Public Property*

The University has a adopted a policy, practice and custom severely and unconstitutionally restricting the exercise of the free speech rights by students. (Complaint ¶¶ 21–35 & Exhibits A & B). Specifically, the enforced policy of the University constrains expressive activities classified as "demonstrations, picketing, and rallies" to a "Free Speech Area" comprising less than 0.1% of the University's total West Campus. (Complaint ¶¶ 26-31, 35-37). What constitutes a "demonstration," "picketing," or "rally" is undefined by the policy, thus allowing for arbitrary and capricious enforcement of the policy by those charged with the policy's enforcement.

And not only does the policy have such critical terms undefined, the policy further requires that students or student groups wishing to engage in such activities "must give prior notice of ten (10) working days to the University Police." (Complaint Exhibit A). Students who fail to properly schedule their expressive activity, as well as those who do not contain such

4

activity to the Free Speech Area, are subject to face university discipline processes and/or criminal charges of trespassing.  (Complaint Exhibit A).

## C.  *UC's Application of the Policy to Mr. Morbitzer and YAL*

On February 9, 2012, Mr. Morbitzer inquired of the University (and, specifically, the Office of Campus Scheduling) regarding Plaintiffs' desire to promptly begin collection of signatures in support of the Ohio Workplace Freedom Amendment initiative petition effort.  As part of their inquiry, Plaintiffs also sought clarification as to whether their expressive activity qualified as a "demonstration, picket, or rally" such that the University would attempt to constrain and limit Plaintiffs' exercise of their free speech rights to the confines of the Free Speech Area. (Complaint ¶ 48 & Exhibit F.)  In response to Plaintiffs' inquiry, the Office of Campus Scheduling directed the Plaintiffs to use an online form to request the use of the McMicken Commons Northwest Corner (which is the designated Free Speech Area). (Complaint ¶ 49 & Exhibit G). Also within that response, the University (through Campus Scheduling) was very explicit: "you are not permitted to walk around campus, if we are informed that you are, [the Office of] Public Safety will be contacted."  (Complaint Exhibit G).

Pursuant to the directive received from Campus Scheduling, Plaintiffs completed the additional, online application form.  (Complaint ¶ 52.)  Later that same day, the University (through Campus Scheduling) conditionally approved Plaintiffs' request, but specifically limited Plaintiffs' petitioning effort to the Free Speech Area and reiterated that Plaintiffs were not allowed "walk around."  (Complaint ¶ 54 & Exhibit I.)

On February 15, 2012, Plaintiffs sought to engage in efforts in support of the initiative effort in support of the Ohio Workplace Freedom Amendment, notwithstanding the fact that they were constrained and confined to the so-called Free Speech Area pursuant to the University's

policy.  Because of the isolation of the so-called Free Speech Area, Plaintiffs observed that the overwhelming bulk of pedestrian student traffic occurred outside the limits of the so-called Free Speech Area.  (Complaint ¶ 61).  Thus, Plaintiffs' ability to engage in constitutionally protected expression was severely inhibited by UC policies.

## III.    LAW AND ARGUMENT

Mr. Morbitzer and YAL satisfy the elements necessary for issuance of a temporary restraining order and/or preliminary injunction enjoining the enforcement of the University's policies, practices, and customs that prevent the Plaintiffs from accessing the public spaces of the University—spaces that, ironically, have unequivocally been declared to be dedicated "to teaching, learning, research, and a continuing search for truth."[6]   In the context of First Amendment violations and efforts to obtain preliminary injunctive relief, the "likelihood of success" factor is often determinative.[7]

### A.    Mr. Morbitzer and YAL are likely to succeed on the merits.

Plaintiffs are highly likely to succeed on the merits because Defendants' conduct clearly violates well-established constitutional principles.  *First*, the University of Cincinnati is clearly a state actor, as are the officials adopting and enforcing its policies.[8]   *Second*, Plaintiffs have the right to circulate petitions, gather signatures, and, in the process share opinions, in traditional and designated public fora.  *Third*, all fora at issue in this case are either traditional or designated public fora.  And *fourth*, Defendants' unreasonable policies and conduct are neither narrowly

---

[6]        *See* Plaintiffs' Complaint, Paragraph 21, citing OAC 3361:10-17-01.

[7]        *Connection Dist. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

[8]        *See Thomson v. Harmony*, 65 F.3d 1314, 1319 (6th Cir. 1995) ("The University of Cincinnati is a state instrumentality"); *Hall v. Medical College of Ohio*, 742 F.2d 299, 303–04 (6th Cir. 1984) (discussing how state universities in Ohio, including University of Cincinnati, are considered "arms of the state").

tailored time, place and manner restrictions serving a substantial government interest, nor content neutral. *Finally,* UC's policies are impermissibly vague.

Following the Supreme Court's guidance in *Cornelius v. NAACP Legal Defense & Educ., Fund, Inc.,*[9] free speech claims are analyzed in three steps:

> First, we must decide whether [the speech at issue] is protected under the First Amendment. Second, we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic. Last, we must determine if the [Government's] reasons for prohibiting [the speech at issue] satisfy the appropriate standard.[10]

### 1. Gathering signatures for a statewide constitutional amendment is protected speech.

"[T]he solicitation of signatures for a petition involves protected speech."[11] Indeed, this kind of speech "is at the core of our electoral process and of the First Amendment freedoms – an area of public policy where protection of robust discussion is at its zenith."[12] "[T]he circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"[13] That interactive communication comprises both the request for the signature and the signature itself, because the circulation of an initiative petition not only involves the "expression of a desire for political change," but also is a means of "plac[ing] the matter on the ballot, [and thus making] the matter the focus of statewide discussion."[14] As such, "the circulation of a petition involves an element of speech beyond leafleting or sign-holding, because the collection of signatures – particularly for an initiative or referendum ballot – is essential to accomplishing the circulator's purpose."[15]

---

[9]    473 U.S. 788, 797 (1985).
[10]    *Parks v. City of Columbus,* 395 F.3d 643, 647 (6th Cir. 2005) (internal citations and quotations omitted).
[11]    *Meyer v. Grant,* 486 U.S. 414, 422 n.5 (1988).
[12]    *Id.* at 425. (citation and internal quotation marks omitted).
[13]    *Meyer v. Grant,* 486 U.S. 414, 421–22 (1988).
[14]    *Id.*
[15]    *Id.*

7

Here, there is no dispute that Plaintiffs seek to circulate petitions for a ballot initiative, and there is no evidence or contention that they would engage in any objectionable conduct. Further, the process of collecting signatures will necessarily involve the expression of opinions about the constitutional amendment being proposed.

The fact that the petitioning process constitutes protected speech "merely begins [the] inquiry."[16] The second step is to "identify the nature of the forum, because the extent to which the government may limit access depends on whether the forum is public or nonpublic."[17] Under that analysis, "the extent to which the Government can control access depends on the nature of the relevant forum."[18]

### 2. *Public sidewalks, streets, thoroughfares, grassy spaces, plazas, and other open spaces on the University of Cincinnati's Campus are public fora.*

Plaintiffs seek to gather signatures in public fora beyond the Free Speech Area. State colleges and universities are not enclaves immune from the sweep of the First Amendment,"[19] and "[t]he campus of a public university, at least for its students, possesses many of the characteristics of a public forum."[20] Indeed, "public places" historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be "public fora."[21]

And the more a forum *resembles* a "traditional public forum," the greater an interest the state must show to justify restricting access.[22] A traditional public forum is a forum which "by

---

[16]     *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 799 (1985).
[17]     *Parks*, 395 F.3d at 647 (quoting *Cornelius*, 473 U.S. at 797).
[18]     *Id*. at 800.
[19]     *Healy v. James*, 408 U.S. 169, 180 (1972).
[20]     *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).
[21]     *Id*.
[22]     *Student Government Assoc. v. Board of Trustees of University of Massachusetts*, 676 F. Supp. 384, 386 (D. Mass. 1987), *aff'd* 868 F.2d 473 (1st Cir. 1989).

long tradition or by governmental fiat [has] been devoted to assembly and debate,"[23] alongside comparable governmental properties.[24]

Moreover, "use of a forum as a public thoroughfare is often regarded as a key factor in determining public forum status."[25] Along these lines, the U.S. Court of Appeals for the Sixth Circuit has held that even a privately-owned sidewalk operates as a traditional public forum because, *inter alia*, it is a "public thoroughfare" as it "is open to the public for general pedestrian passage."[26] As stated in that case, to determine if a sidewalk is in fact a traditional public forum depends upon a "case-by-case inquiry in which no single factor is dispositive."[27]

In this case, the sidewalks and open outdoor areas on the University's campus are open to students and the public for general pedestrian passage. As public thoroughfares, such areas are therefore traditional public fora. And the Supreme Court has recently confirmed that public parks remain traditional public fora insofar as "speeches and other transitory expressive acts" are concerned.[28] The open areas of campus are akin to public parks, particularly with regard to Plaintiffs, who are a University-affiliated student group and an individual student.

With regard to Mr. Morbitzer and YAL, a student and recognized student group of the University, the open spaces of the University, including its "streets, sidewalks, and parks" or their equivalents, represent a public forum. "The campus of a public university, at least for its

---

[23]     *Id.*

[24]     *See, e.g., ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1103 (9th Cir. 2003) (publicly-owned pedestrian mall); *Pouillon v. City of Owosso*, 206 F.3d 711, 717 (6th Cir. 2000) (city hall steps); *Warren v. Fairfax County*, 196 F.3d 186, 189 (4th Cir. 1999) (outdoor area in front of county government center).

[25]     *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1101 (9th Cir. 2003) (citing *Kokinda*, 497 U.S. at 727–28).

[26]     *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 452 (6th Cir. 2004).

[27]     *Id.* at 453.

[28]     *Pleasant Grove v. Summum*, 555 U.S. 460, 464 (2009).

9

students, possesses many of the characteristics of a public forum."[29]  In a very similar case, the Northern District of Texas declared Texas Tech University's "free speech gazebo" policy, which limited free speech activities to one small gazebo on campus, to be unconstitutional. The court found as follows:

> [T]o the extent the campus has park areas, sidewalks, streets, or other similar common areas, these areas are public forums, at least for the University's students, irrespective of whether the University has so designated them or not. These areas comprise the irreducible public forums on the campus. Of course, the University, by express designation, may open up more of the residual campus as public forums for its students, but it can not designate less.[30]

This Court should therefore find that the fact that public sidewalk, streets, grassy open areas, and plazas are on a public university campus does not reverse the general rule that these sorts of public spaces are public fora, particularly with regard to students, faculty, and other members of the University community.

### 3.  *The University of Cincinnati "Free Speech Area" is a public forum.*

On account of the same considerations just outlined, UC's Free Speech Area, a grassy open space between slant walks measuring 82 by 124 feet, is clearly a public forum.  And in addition to those considerations, the Free Speech Area is a public forum because UC has caused it to be as much.

A public forum can be created when government "opens a piece of public property to the public at large, treating [it] as if it were a traditional public forum."[31]  Put another way, the government may create a public forum by "intentionally opening a nontraditional forum for public discourse."[32]  Courts look to "the nature of the property and its compatibility with

---

[29]  *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).
[30]  *Roberts v. Haragan*, 346 F. Supp. 2d 853, 861–862 (N.D. Tex. 2004) (footnote omitted).
[31]  *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010).
[32]  *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 802 (1985).

expressive activity,"[33] and also whether the government makes the property "generally available to a class of speakers, or grants permission as a matter of course. Restrictions on expression in such fora are evaluated under the same standard as that applicable to traditional public fora."[34]

The government's decision to limit access to the property is not dispositive in answering whether or not the government created a public forum.[35]  In *Bowman v. White*,[36] the Eight Circuit found that a university had created a public forum in several outdoor areas on campus because "[t]he objective evidence in the record shows these particular areas combine the physical characteristics of streets, sidewalks, and parks, and are open for public passage.  They do not include university buildings or stadiums, but they are located within the boundaries of the campus."[37]  The court rejected the university's argument that these outdoor areas were nonpublic fora, pointing to the university's policies and procedures permitting both students and outsiders to speak in the areas.[38]

These policies led the court to determine that the university had "designated the areas in question as locations for free expression" and held that the several outdoor areas on campus were "unlimited designated public fora" because "although the University gives preferential treatment to University Entities over Non-University Entities in regard to use of University space, there is little evidence that the University intended to limit the use of University space to a particular type of speech or speaker.[39]  Given the UC designation of the Free Speech Area for use by student speakers, as outlined in the policies herein and elsewhere, the Free Speech Area is clearly a public forum.

---

[33]     *Id.*
[34]     *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983).
[35]     *Id.* at 805.
[36]     444 F.3d 967 (8th Cir. 2006).
[37]     *Id.* at 977.
[38]     *Id.* at 978–79.
[39]     *Id.* at 979.

**4. *Sixth Circuit precedent does not alter the conclusion that UC's public sidewalks, streets, thoroughfares, grassy spaces, plazas, other open spaces and "Free Speech Area" are public fora.***

In *Gilles v. Garland*, the Sixth Circuit upheld the lower court's determination, *based on the specific facts in that case*, that Miami University's outdoor areas were limited public fora. *Gilles* involved claims by a non-student outsider for access to the campus grounds who had *not* obtained the sponsorship of a student organization.[40] Here, instead, the desired speech is not by someone foreign to the University but, rather, students and an officially recognized student group.

As the Fifth Circuit has noted:

> The distinction between limited and designated public fora is not a simple "all-or-nothing" proposition.  The Supreme Court's forum analysis jurisprudence does not require us to choose between the polar extremes of treating an entire university campus as a forum designated for *all* types of speech by *all* speakers, or, alternatively, as a limited public forum where any reasonable restriction on speech must be upheld.  Instead, as the Supreme Court indicated in *Arkansas Public Television Assn. v. Forbes*, a given forum may be designated for one class of speaker or speech, and still "limited" with respect to others.[41]

To this end, the Sixth Circuit in *Gilles* contrasted the specific finding regarding Miami University with the Eighth Circuit's analysis in *Bowman*:

> The *Bowman* court went on to hold that open areas analogous to those in which plaintiff seeks permission to speak at Miami University were "unlimited designated public fora," i.e., areas where the University of Arkansas (1) had permitted university entitles and non-university entities to speak; (2) had given preferential treatment to university entities; and (3) had not intended to limit the use to a particular type of speech or speaker.[42]

---

[40]     *Gilles*, 281 Fed. Appx. 501 (6th Cir. 2008); *cf. Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) ("[t]he campus of a public university, *at least for its students*, possesses many of the characteristics of a public forum")(emphasis added).

[41]     *Justice for All v. Faulkner*, 410 F.3d 760, 766 (5th Cir. 2005) (emphases in original).

[42]     *Gilles*, 281 Fed. Appx. at 509–10.

The University of Cincinnati policies and practices at issue here more closely resemble those of the University of Arkansas addressed in *Bowman* than the Miami University policies and practices addressed in *Gilles*.  Unlike Miami University, the University of Cincinnati does not limit outside individuals or groups to speaking on campus grounds only if they have an invitation from a student group.[43]  Instead, the University of Cincinnati's policy is like the University of Arkansas policies which the Sixth Circuit cited in *Gilles* as supporting *Bowman*'s finding of a public forum: the University of Cincinnati (1) permits both persons and groups affiliated with the University and outsiders to speak on campus, (2) gives preferential treatment to those affiliated with the University over outsiders, and (3) has displayed no intention of limiting use to a particular type of speech or speaker in these areas.[44] As a result of this distinction, the Sixth Circuit's forum analysis in *Gilles* is inapposite when applied to the instant case and, thus, at a minimum, the open areas and sidewalks of the University of Cincinnati should be considered to public forums for the purpose of student speech.

Moreover, *Gilles* was decided prior to *Pleasant Grove v. Summum,*[45] wherein the Supreme Court "clarified" its forum analysis.[46]  Prior to *Summum*, there had been significant "confusion surrounding the use of the terms 'designated public forum' and 'limited public forum,'"[47] with courts often conflating the two.  And in *Gilles*, the Sixth Circuit treated or

---

[43]    *See Gilles*, 281 Fed. Appx. at 502–03; *id*. at 511–12.
[44]    The U.S. Court of Appeals for the Eleventh Circuit has also held that certain of a public university's outdoor areas have been designated a public forum when the university allows speech there without regard to content or identity of speaker.  *Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011).
[45]    555 U.S. 460 (2009).
[46]    *Miller v. City of Cincinnati*, 622 F.3d 524, 535 n.1 (6th Cir. 2010).
[47]    *United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738, 750 (6th Cir. 2004).

13

considered a designated public forum and a limited public forum to be synonymous – mistakenly, in light of new Supreme Court precedent.[48]

Finally, and perhaps most importantly, *Gilles* did not deal with a student-speaker. This Court should therefore adopt the reasoning of other courts and conclude that the open outdoor areas, including the Free Speech Area but also beyond it, are traditional or designated public fora.[49]

    5.   *UC's capacity to regulate core political speech in these fora is strictly limited.*

In these fora, state actors such as UC may promulgate and enforce "time, place, and manner" regulations only when those regulations are (1) reasonable; (2) "content-neutral;" (3) "narrowly tailored to serve a significant government interest;" and (4) sufficient to "leave open ample alternative channels of communication."[50] Additionally, absolute prohibitions on a particular type of expression, such as that of signature-gathering on public areas beyond the Free Speech Area, will be upheld only if narrowly drawn to accomplish a *compelling* governmental interest.[51]

    6.   *The burdens UC imposes on core political speech are not narrowly-tailored to serve any significant governmental interest, much less a compelling one.*

---

[48]     *Gilles*, 281 Fed. Appx. at 508–09 ("[t]here are three recognized types of forum: 'The first type is a traditional public forum. . . . The second type of forum has been alternatively described as a "limited public forum," . . . and as a "designated public forum.". . . The third and final type of forum is a nonpublic forum'" (quoting *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (en banc))).

[49]     *See, e.g., Smith v. Tarrant County College Dist.*, 694 F. Supp. 2d 610, 633 (N.D. Tex. 2010) ("TCC has conceded that the public-forum-type areas on its campuses, such as streets, sidewalks, and outdoor common areas (such as lawns and plazas) are designated public forums for students. As such, rules or regulations restricting speech in these areas must withstand strict scrutiny."); *Hays County Guardian v. Supple*, 969 F.2d 111, 116 (5th Cir. 1992) ("The undisputed facts show that the outdoor grounds of the campus such as the sidewalks and plazas are designated public fora for the speech of university students.").

[50]     *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983).

[51]     *United States v. Grace,* 461 U.S. 171, 177 (1983) (citations omitted) (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983)).

Time, place, and manner regulations must "promote a substantial government interest that would be achieved less effectively absent the regulation."[52]  Here, the interest in prohibiting core political speech that is not disruptive in any manner is, at best, unclear.  In its December 22, 2008 letter to the Foundation for Individual Rights in Education ("FIRE") defending its policy, UC cites "the potential for disruption to the University's educational mission." (Complaint Exhibit D).

However, in identifying such an interest, the University must do more than "assert[] interests [that] are important in the abstract."[53]  Courts do not recognize an interest as significant if it is merely "conjectural" rather than "real."[54]  Thus, there is no government interest, much less a substantial or compelling one, in deterring the *potentiality* of "disruption to the University's educational mission."  Indeed, the Supreme Court has noted that "undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression" on a college campus.[55]

This leaves UC with an interest in prohibiting *actual* disruption of its educational mission.  To be narrowly tailored, a regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests."[56]  A "[policy] is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."[57]

**a. UC's policy of prohibiting *all* political speech loosely characterized as demonstrations, pickets, and rallies outside of the "Free Speech Area" is not narrowly tailored to prevent "disruption of UC's educational mission."**

---

[52]  *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989).
[53]  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).
[54]  *Id.*
[55]  *Healy*, 408 U.S. at 191 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969)).
[56]  *Id.* at 799.
[57]  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

First, the Supreme Court has stressed the importance of providing access "within the forum in question."[58]  "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."[59] Consequently, UC's policy of providing an outlet for free speech within narrow confines of the Free Speech Area does not mitigate UC's obligation to make other public fora available for this speech.  Likewise, the fact that the University allows signature gathering in the Free Speech Area does not serve to make that restriction narrowly tailored given that the broader 99.9% of campus beyond that area is restricted from students such as Defendants, upon pain of university discipline and criminal charges. (Complaint ¶ 36 (noting that "[t]he Free Speech Area is approximately 10,000 square feet" and that "[t]he West Campus of the University is 137 acres, or approximately 8,506,833 square feet")).

Second, if UC's restriction on demonstrations, pickets, or rallies applied only to classroom space, the interior of academic buildings, or even the steps and entrances to academic buildings, it might be considered to be narrowly-tailored to prevent the disruption of the educational process   However, it is unclear how Mr. Morbitzer and YAL could possibly disrupt the *formal* educational process by *informally* educating their fellow students on the merits of a proposed constitutional amendment via conversations held outside University buildings and without impeding those students' ability to get to and from the classroom or other educational events. Ironically, prohibiting Mr. Morbitzer and YAL from educating their fellow students on public sidewalks and open spaces throughout campus serves to "disrupt" the educational process and the spirit of free debate to which the University claims commitment in its statement of interest. Indeed, by restricting expression such as Plaintiffs' to a mere sliver of campus, the

---

[58]     *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 655 (1981).
[59]     *Reno v. ACLU,* 521 U.S. 844, 880 (1997) (quoting *Schneider v. New Jersey,* 308 U.S. 147, 163 (1939)).

16

University disrupts the ability of its students to enjoy the educational benefits of dialogue on the public university campus, identified by the Supreme Court as "peculiarly the marketplace of ideas."[60]

Finally, YAL's desired speech does not occupy space desirable for other educational uses, create noise or commotion, block traffic, or otherwise interfere with any university functions.  Ironically, if relegated to the Free Speech Area, the experience of Mr. Morbitzer and YAL only confirms that these students will need to shout and scream to draw attention to themselves, in order to get their classmates, on the other 99.9 percent of campus to *come to them* to sign the petition.  This is actually more likely to disrupt education at UC then simply permitting Plaintiffs to engage in the supposedly criminal offense of "walking around."

Consequently, prohibiting all gathering of signatures in all quarters of campus beyond the free speech zone is not narrowly-tailored to serve the government interest in preventing disruption of UC's educational mission.  Accordingly, there is little likelihood of UC demonstrating that its prohibition on education through political speech in all public forums other than in the Free Speech Zone is narrowly-tailored to service of the interest of prohibiting actual disruption of education.

Moreover, any "time, place and manner" regulations in a traditional or designated forum must leave open ample alternative means of communication.  Here, the University's restriction of Plaintiffs' signature gathering to the Free Speech Area – which constitutes just 0.1% of West Campus and is removed from the main course of travel of most students – fails this standard.  By unreasonably restricting Plaintiffs from being able to request that persons on campus sign their

---

[60]     *Healy v. James*, 408 U.S. 169, 180 (1972).

petitions, the University has failed to leave open ample alternative means of communication of their message.[61]

> **b.  UC's policies burdening all political speech loosely characterized as demonstrations, pickets, or rallies inside of the Free Speech Area are not narrowly tailored to prevent "disruption of UC's educational mission."**

UC's imposition of a permit requirement and 10– to 14–day waiting period as a prerequisite to engaging in political speech loosely defined as "demonstrations, picketing and rallies" within the Free Speech Area (Complaint ¶¶ 25, 31–32) is not narrowly-tailored to prevent disruption of UC's educational mission.  Because of weekends, this period is at least fourteen calendar days, and more if a holiday falls within the period.  This waiting period prohibits spontaneous expressive activity in reaction to newsworthy events.

As to this burden, the Supreme Court has specifically held that "there is a significant amount of spontaneous speech that is effectively banned by the ordinance. A person who made a decision on a holiday or a weekend to take an active part in a political campaign could not begin to pass out handbills until after he or she obtained the required permit.  Even a spontaneous decision to go across the street and urge a neighbor to vote against the mayor could not lawfully be implemented without first obtaining the mayor's permission."[62]  And the political speech of Mr. Morbitzer and YAL was actually inhibited in this manner:  after learning that the Ohio Ballot Board had approved the language of the Ohio Workplace Freedom Amendment for circulation on February 9, Mr. Morbitzer and YAL student-members wished to immediately began gathering signatures for the Amendment; however, they instead were required to register with UC and wait ten business days (while this may seem negligible in the course of a 120

---

[61]    *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1229 (9th Cir. 1990) ("An alternative is not ample if the speaker is not permitted to reach the intended audience.") (internal quotation marks omitted).

[62]    *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150, 167 (2002).

signature drive, one can imagine the impact on municipal referendum, which typically allows for a 30 day window, if all state actors in Cincinnati required ten business before citizens could begin to gather signatures – the 30 day window becomes a 16 day window).

The Sixth Circuit has supplemented this understanding, noting that "any notice period is a substantial inhibition on speech because notice provisions can stifle our most paradigmatic examples of First Amendment activity. [T]he simple knowledge that one must inform the government of his desire to speak and must fill out appropriate forms and comply with applicable regulations discourages citizens from speaking freely. This concern is heightened further where, as here, the notice period restricts the public's use of streets and sidewalks for political speech."[63]

With this burden on speech in mind, the Sixth Circuit has held that while "the City that it has a significant interest in providing for traffic and crowd control for certain events in order to protect the public's safety and welfare," a "30-day notice provision burdens substantially more speech than is necessary to accomplish this legitimate goal and is not narrowly tailored to serve the City's interests."[64] Similarly here, UC has imposed a significant burden on speech that burdens substantially more speech than is necessary. Even if YAL's signature-gathering could be shown to be a disruption to UC's educational mission, there is no justification for why UC requires ten days to plan for this putative "disruption": there is obviously no need to draw up a complex strategy, be it for security purposes or otherwise, to plan for several students gathering signatures in a quiet, peaceful manner. What is it that UC must do over the course of these ten days to prepare for this non-disruptive speech?

---

[63] *Trewhella v. City of Findlay*, 592 F. Supp. 2d 998, 1007 (6th Cir. 2008) (internal citations and quotations omitted).

[64] *Id*.

Separately, it is no defense that the permitting process and waiting period is needed because larger, more disruptive groups may wish to gather signature at UC. In fact, prohibiting the spontaneous and non-disruptive speech of these students simply to provide a check against this separate hypothetical occurrence would demonstrate the law to be something other than narrowly-tailored: it would prohibit substantially more speech than necessary to prevent disruption of education.

UC's most compelling explanation for the waiting period would seem to be that it has *created* the very problem that necessitates the solution of a permitting process and waiting period: by limiting expressive activity to one tenth of one percent of the entire campus, the demand of UC's tens of thousands of students to speak greatly outpaces the UC's supply of space to speak. This explanation is not a defense at all: a state actor cannot claim to have crafted a narrowly-tailored advancement of an interest that arises from its own prior malfeasance. In this sense, the unconstitutionality of the onerous waiting period and permitting process for the Free Speech Area is inextricably intertwined with the unconstitutional prohibition of political speech everywhere else on campus.

It was for this very reason that in *Community for Creative Non-Violence v. Turner,* the D.C. Circuit held that a Washington Metropolitan Area Transit Authority (WMATA) regulation, which required permits for organized free speech activities at Metro stations, failed to provide ample alternatives means because there were "no WMATA areas not covered by the permit requirement" and hence "no intra-forum alternative[s]."[65] Similarly here, there is no area on campus where YAL students can gather signatures without first obtaining permission, *i.e.*, a license issued by the government to authorize one to engage in First Amendment rights. The

---

[65] *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990).

University's requirement that Plaintiffs receive permission after a notification period before engaging in expressive activity that would not interfere with any legitimate interest of the University is therefore not narrowly tailored in service of *any* identifiable substantial government interest, including that of preventing actual disruption to the educational process.

Accordingly, there is little likelihood of UC demonstrating its permitting process and waiting period for education through political speech within a public forum to be narrowly-tailored to service of the interest of prohibiting actual disruption of education.

### 7.  *The burdens UC imposes on core political speech are unconstitutionally vague.*

When vague, "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression."[66]  Thus, even if (1) UC's absolute prohibition on political speech in all open and public spaces beyond the Free Speech Area; (2) UC's 10– to 14– day waiting period and permitting process for the right to engage in political speech; and (3) its quarantining of political speech to 0.1 percent of campus could be found to be narrowly-tailored to serve its interest in preventing the disruption of education, UC still could not carry its burden: its regulations are impermissibly vague.

When attempting to abridge political speech, the Supreme Court has spoken of the test to be applied to regulations that implicate vagueness concerns:  The test is whether the language . . . affords the "(p)recision of regulation (that) must be the touchstone in an area so closely touching our most precious freedoms."[67]  Otherwise, vague laws may not only "trap the innocent by not providing fair warning" or foster "arbitrary and discriminatory application" but also operate to inhibit protected expression by inducing "citizens to ' "steer far wider of the unlawful zone " . . .

---

[66]     *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (referring to an official's overly broad discretion in granting or denying a speech-related permit).

[67]     *NAACP v. Button*, 371 U.S. 415, 438 (1963).

than if the boundaries of the forbidden areas were clearly marked.'"[68] "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."[69]

In *Gilles v. Garland*, [70] the Sixth Circuit held that a complaint pleaded a sufficient void-for-vagueness claim against a university policy regulating expression on campus grounds by outsiders. The policy at issue stated that "[e]very person with legitimate business at the University has the privilege of free access to the public areas of the buildings and grounds during those hours when they are open, such hours to be determined by the President or designated University official."[71] The university in *Gilles* claimed that the term "legitimate business" required outsiders to have a student group sponsor in order to speak on campus grounds. The Sixth Circuit held that the plaintiff in that case, an outsider seeking to speak on campus grounds but unable to secure a student group sponsor, had adequately alleged that the policy was void for vagueness:

> A policy need not be reduced to writing to survive vagueness challenge. However, if "legitimate business" as used in the written access policy, is defined by "consistent practice" to mean that visitors are denied access to give a formal speech unless invited by a student organization, then the limiting practice must be "well-understood and uniformly applied." *The present pleadings afford no basis for concluding that the student-sponsorship requirement is well-understood. To the extent the pleadings afford any insight into the operation of the unwritten policy, we can conclude only that it was not well understood by university officials charged with most immediate responsibility for enforcing it.*[72]

---

[68]     *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972), quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964).

[69]     *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963).

[70]     281 Fed. Appx. 501 (6th Cir. 2008).

[71]     *Id*. at 502.

[72]     *Id*. at 507–08 (internal citations omitted) (emphasis added).

22

Here, UC policy fails to establish a definition of "demonstration, picket, or rally." A person of ordinary intelligence would not presume one-on-one communication with fellow students regarding the merits of a proposed state constitutional amendment, pursuant to obtaining those students' signatures, would constitute either a demonstration, picket, or rally. However, when Mr. Morbitzer explicitly asked UC regulators whether petitioning fell within the scope of these three terms, UC's instant response was to require Mr. Morbitzer and YAL to abide by the policy governing demonstrations, pickets, and rallies. (Complaint ¶¶ 49-59, & Exhibit G). Thus, UC clearly considers these terms to be broad enough to include petitioning. Thus, "[the regulation's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion."[73]

Moreover, "when a law or regulation predicates expressive activity on the prior acquisition of a permit, *the rule must contain narrow and precise standards* to control the discretion of the permitting authority."[74] By failing to define the terms "demonstration, picket, or rally," the Defendants reserve to themselves unbounded discretion in determining which speakers will be confined to the Free Speech Area and subject to the ten-day notification period. Such unfettered discretion is evident here, as Defendants have sometimes classified functionally identical expressive activities as a "demonstration, picket or rally" limited to the Free Speech Area and have sometimes not. (Complaint ¶¶ 67-74). "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point

---

[73] *United Food & Commercial Workers Union Local 1099 v. Southwest Ohio Regional Trans. Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

[74] *Parks v. Finan*, 385 F.3d 694, 699 (6th Cir. 2004) (citing *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).

23

of view."[75] As the Supreme Court has stated, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional."[76]

Consequently, there is little likelihood of UC demonstrating its unbounded standards to contain the precision necessary to be constitutionally permissible.

### 8. *The burdens UC imposes on core political speech are not content neutral.*

"Once a forum has been opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusion from a public forum may not be based on content alone, and may not be justified by reference to content alone."[77] Circulation of petitions itself is a class of speech with its own unique content. As noted by the Supreme Court:

> [t]he circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change. Although a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures, he or she will at least have to persuade them that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it. [78]

Thus, circulation of petitions is not only a manner of protected speech, but a type of protected speech that necessarily bypassing official state authorities in favor of taking issues directly to the general citizenry.

Defendants' policy, which includes broad definitions of "demonstration," "picket," and "rally," so as to including the gathering signatures for petitions, is not content neutral. It limits

---

[75]     *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130–31(1992) (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc*., 452 U.S. 640, 649 (1981)).
[76]     *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51 (1969).
[77]     *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95–96 (1972).
[78]     *Meyer v. Grant,* 486 U.S. 414, 421–22 (1988).

only this type of speech to the Free Speech Area and requiring a notification period of ten working days for only this type of speech.  All other types of expressive activity, which may range from wearing a controversial t-shirt, to carrying a banner, bumper sticker, or sign, to engaging fellow students in one-on-one conversations without an initiative petition, are not singled out in such a manner.

Moreover, as articulated in Plaintiffs' Complaint, petitioning on other issues has been permitted beyond the Free Speech Area in the past.  (Complaint ¶¶ 67-74).  Thus, even different types of signature-gathering are treated differently. Whether this is based on happenstance or due to the content of the initiative petitions is irrelevant:  either is constitutionally impermissible. Consequently, there is little likelihood of UC demonstrating that its regulation of speech on campus is sufficiently content neutral.

### B.  Mr. Morbitzer and YAL are confronted with irreparable injury.

Even a temporary deprivation of First Amendment freedom of expression rights is generally sufficient to prove irreparable harm.[79]  Thus, satisfaction of the first prong of the preliminary injunction standard – demonstrating a strong likelihood of success on the merits – also satisfies the irreparable injury standard.[80]  Plaintiffs have demonstrated a substantial likelihood of success on the merits. Thus, Plaintiffs will suffer irreparable injury if Defendants are not immediately enjoined from enforcing its unconstitutional policy.

Moreover, for the Ohio Workplace Freedom Amendment to qualify for the November ballot, over 385,000 valid signatures must be submitted no later than July 9, 2012.  Given this

---

[79]    *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1012 (7th Cir. 1990).
[80]    *See Elrod v. Burns*, 427 U.S. 347, 373 (1973) (holding that if a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated); *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (finding that "when a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor").

deadline, on each occasion where Plaintiffs are unable to engage their fellow students and voters not only results in a direct violation of their constitutional rights, but also impermissibly impedes their capacity, also protected by the First Amendment and the Ohio Constitution, to effectively advance a citizen-initiated constitutional amendment. In fact, if applied to any upcoming referendum effort or ten-day cure period for signature gathering, the UC policies would essentially wipe out any opportunity for effective participation in these efforts on campus (YAL anticipates engaging in such future efforts).

### C. No public interest is served by continued enforcement of the policies against Mr. Morbitzer and YAL, nor would be private harm accrue.

Neither UC nor others will suffer any harm if they are enjoined from enforcing this unconstitutional policy against Mr. Morbitzer and YAL. There is no reason to believe that University operations would be threatened. And the unconstitutional character of these policies leaves UC with no legitimate interest in their continued application. On the other hand, the public interest is served by protecting free expression on a public university campus, maximizing political activity, striking down policies that chill speech, and by vindicating Plaintiffs' constitutional rights.[81]

## IV. CONCLUSION

The University of Cincinnati, through adoption and enforcement of its policies (1) quarantining all political speech loosely characterized as demonstrations, pickets, or rallies to a Free Speech Area approximately 82 by 124 feet; (2) even then requiring acquisition of a permit and a waiting period of up to 14 calendar days prior to engaging in speech; and (3) prohibiting all political speech loosely characterizes as demonstrations, pickets, or rallies on all other open

---

[81]   *See G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights").

spaces, streets, sidewalks, and plazas on campus, have impermissibly burdened the constitutional rights of student Chris Morbitzer and student-members of YAL, imposing irreparable injury without public benefit in the process.  For the foregoing reasons, this Court must enjoin all enforcement of the aforesaid policies at once.

Respectfully submitted,

*/s/ Ryan D. Walters*_____
Ryan D. Walters (0076724)
    *Trial Attorney for Plaintiffs*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
208 E. State Street
Columbus, Ohio 43215
Tel: (614) 340-9817
Fax: (614) 365-9564
rwalters@ohioconstitution.org
mthompson@ohioconstitution.org

Curt C. Hartman (0064242)
*Co-counsel for Plaintiffs*
The Law Firm of Curt C. Hartman
3749 Fox Point Court
Amelia, Ohio 45102
Tel: (513) 752-8800
hartmanlawfirm@fuse.net

**CERTIFICATE OF SERVICE**

      I certify that a copy of the foregoing, together with the memorandum in support, as well

as the verified complaint, will be served upon the following via e-mail on the date of filing:


Mitchell McCrate
General Counsel
University of Cincinnati
_mitchell.mccrate@uc.edu_

                            _/s/ Curt C. Hartman_               

                            Curt C. Hartman (0064242)
                                _Co-counsel for Plaintiffs_
                            The Law Firm of Curt C. Hartman
                            3749 Fox Point Court
                            Amelia, Ohio 45102
                            Tel: (513) 752-8800
                            hartmanlawfirm@fuse.net