UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNIVERSITY OF CINCINNATI          Case No. 1:12-cv-155
CHAPTER OF YOUNG AMERICANS
FOR LIBERTY, *et al.*,          Judge Timothy S. Black

      Plaintiffs

v.

GREGORY WILLIAMS, *et al.*,

      Defendants.

**ORDER GRANTING IN PART
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION,
ENJOINING ENFORCEMENT OF CERTAIN NOTICE AND LOCATION
REQUIREMENTS OF THE UNIVERSITY OF CINCINNATI'S
FREE SPEECH POLICIES AS APPLIED TO STUDENTS**

This civil case presents the question, among others, as to whether the University of

Cincinnati, a public university, may constitutionally subject speech on its campus, by both

students and outsiders alike, to a prior notice and permit scheme and restrict all

"demonstrations, picketing, and rallies" to a Free Speech Area which constitutes less that

0.1% of the grounds of the campus. For the reasons stated here, the Court determines that

such a scheme violates the First Amendment and cannot stand.

As a threshold matter, and as the Supreme Court of the United States has clearly

stated: "It is offensive – not only to the values protected by the First Amendment, but to

the very notion of a free society – that in the context of everyday public discourse a

citizen must first inform the government of her desire to speak to her neighbors and then

obtain a permit to do so." *Watchtower Bible and Tract Soc'y of NY, Inc. v. Vill. of*

*Stratton*, 536 U.S. 150, 165-66 (2002).  Moreover, the precedents of the Supreme Court "leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large.  Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citations omitted).  Indeed, according to the Supreme Court, "the college classroom and its environs is peculiarly the 'marketplace of ideas,'" *id.*, and "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  While universities surely have a right to regulate use of their property, they must do so narrowly and the mere "undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression on a college campus."  *Healy*, 408 U.S. at 191.

Here, what prompted this lawsuit was the University of Cincinnati's determination that students members of the UC Chapter of Young Americans for Liberty were denied the right to circulate freely across the college campus seeking to gather signatures on petitions to place the Ohio Workplace Freedom Amendment on the November 2012 ballot.  Instead, the students were advised that they could only gather signatures within the McMicken Commons Northwest Corner (which UC designates as the Free Speech Area and is less than one tenth the size of a football field), and if any signature gathering were to occur anywhere else on the campus, the students would be subject to arrest.

After complying with this directive, Plaintiffs assert that in one day of work they managed to gather only one signature and were only able to interact with six students as a result of the low pedestrian traffic in and adjacent to the Free Speech Area.  This lawsuit followed.

Plaintiffs claim that the University's prohibition against any and all spontaneous student speech anywhere on campus, *i.e.*, speech in the absence of adherence to UC's five to 15 day notification requirements and prior permission, is overbroad and facially unconstitutional.  Plaintiffs argue that the unconstitutionality of this prior restraint is enhanced by the vague terms the University uses to assess the length of the applicable notification requirement and the vesting of immense sole discretion in untrained low-level persons for determining how speech is to be classified. According to Plaintiffs, the unconstitutionality of this vagueness and discretion is enhanced by their coupling with prior restraints on all student speech on campus.  Moreover, by burdening all student speech, rather than just disruptive or crowd-gathering speech, Plaintiffs assert that the University's combined speech policies are not narrowly tailored to achieve the regulatory interests that the University asserts (*e.g.*, public order and safety) .

The University responds that it "has an interest in regulating ALL expressive activity on its campus" and therefore is permitted to limit all expressive activities, bound only by reasonableness.  To reach this conclusion, and thereby avoid strict scrutiny, the University has unilaterally declared that its entire campus is a limited public forum.

## ANALYSIS

Plaintiffs seek a preliminary injunction prohibiting the University from enforcing its free speech policies on the grounds that the policies act as an unconstitutional prior restraint, are unconstitutionally vague, and allow arbitrary application by government officials. (*See* Doc. 5 at 7). Defendants oppose Plaintiffs' motion and seek summary judgment upholding the constitutionality of the old policies. (*See* Docs. 42 & 44).[1]

---

[1]  Before resolving the merits of the motions, the Court must address Defendants' threshold objection that its modification of the policies after the lawsuit was filed renders Plaintiffs' claims moot and precludes the Court from deciding the case.

"An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Ariz. for Official English v. Ariz.*, 520 U.S. 43, 67 (1997) (internal citations omitted). Federal courts have "no authority to render a decision upon moot questions." *Campbell v. PMI Food Equip. Grp, Inc.*, 509 F.3d 776, 781 (6th Cir. 2007) (internal quotations omitted). However, "a defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 583 (6th Cir. 2012) (quoting *Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 174 (2000)) (emphasis supplied). Instead, Defendants bear "the formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.

Here, Defendants have not met their burden. While Defendants cite President Williams's affidavit that the old policies will not be reenacted as evidence that they cannot reasonably be expected to recur, the University's statement is insufficient to preclude jurisdiction. (*See* Doc. 54 at 14). The Government's abandonment of the challenged practice is "an important factor bearing on the question of whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the *exercise* rather than the *existence* of judicial power." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (emphasis supplied).

Further, a new policy that disadvantages Plaintiffs in the same fundamental way as the old one, albeit to a possible lesser degree, does not moot the case. Courts should look to the "gravamen of petitioner's complaint." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). Here, the "gravamen" of Plaintiffs' free speech claim is that the University policies impose an unconstitutional prior restraint on expressive activity. (*See* Doc. 15 at ¶¶ 90-91). The new policies may impose shorter notice requirements, but they still harm Plaintiffs in the same fundamental way by imposing a notice requirement for all student speech on campus. As in *Northeast Florida*, the Court need not speculate whether the Defendants will return to the allegedly wrongful conduct because they already have in the form of the new policy.

With respect to the due process claim, Plaintiffs' central complaint is that the policies are so vague as to deny fair notice of the conduct subject to the regulation and to provide university officials with unbridled discretion. (Doc. 15 at ¶¶ 95-101). The Defendants assert that because the revised policies

Federal district courts balance the following factors in addressing motions for a preliminary injunction: "(1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction." *Miller v. Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).

Plaintiffs allege that the University's policies impose an unconstitutional prior restraint on the First Amendment guarantee of free speech. Courts use a three-part test to evaluate a First Amendment claim: (1) whether the speech is protected; (2) the nature of the forum where the speech is to occur and the proper standard for restrictions in that forum; and (3) whether the government justification satisfies the applicable standard. *Cornelius v. NAACP Legal Defense & Education Fund,* 473 U.S. 788, 797 (1985).

---

include definitions of the challenged terms, the due process claims are now moot. (Doc. 54 at 24). However, <u>Defendants may not "insulate themselves from liability by simply amending the regulation."</u> *Stephenson v. Davenport Cmty Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (emphasis supplied). Further, the presence of Plaintiffs' nominal damages claim preserves jurisdiction. *Miller v. Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010).

Finally, the timing of the University's changes leaves this Court with no assurance that the challenged conduct will not be re-implemented, absent an injunction, at the conclusion of this litigation. *See DeJohn v. Temple Univ.*, 537 F.3d 301, 309 (3d Cir. 2008). Despite previous complaints regarding its policies, the University did not amend its regulations until after the commencement of this litigation and only a few weeks before the scheduled final injunction hearing. Additionally, the University continues to defend the constitutionality of its former policy. These two factors are significant in determining whether there is a reasonable expectation that the challenged conduct may recur. *Id.*; *see also Parents Involved in Cmty Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); (holding that voluntary cessation in response to litigation does not satisfy the heavy burden to demonstrate that the challenged conduct cannot reasonably be expected to occur).

Accordingly, Defendants' voluntary cessation of the challenged policy does not render Plaintiffs' claims moot and the Court retains jurisdiction.

As to the first element, "[t]he solicitation of signatures for a petition involves protected speech." *Meyer v. Grant*, 486 U.S. 414, 422 n. 5 (1988).  This type of speech is "at the core of our electoral process and of the First Amendment freedoms – an area of public policy where protection of robust discussion is at its zenith." *Id*. at 425 (internal citations omitted).  Obviously, core political speech, like petition signature gathering, is "protected speech." Plaintiffs have therefore satisfied the first element of the free speech claim.

Because the speech at issue is clearly protected, the Court next turns to the nature of the forum.  Courts use "forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius*, 473 U.S. at 800.

There are three types of public forum: (1) the traditional public forum, made up of parks, sidewalks, and other areas that "by tradition or government fiat" are available for public use and discussion; (2) the designated public forum, where the government opens a piece of state property to the public at large, treating it as if it were a traditional public forum even it does not fall into the precise parameters of tradition; and (3) the limited public forum, which is created by the government for use by certain groups or limited to solely to the discussion of certain topics.  *Miller*, 622 F.3d at 534-535.  In contrast, a nonpublic forum is government property that by tradition or usage is not a forum for public discussion. *Id*.

<u>The forum analysis is crucial because while regulations on speech in traditional and designated public fora are subject to strict scrutiny and must serve a compelling interest and be most narrowly drawn, in a limited public forum, the government may restrict speech so long as the regulations are viewpoint neutral and merely reasonable in light of the purpose served by the forum.</u>  *Id*.

In examining whether property constitutes a public forum, the Supreme Court has made it clear that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (internal citations omitted).  Nevertheless, the Supreme Court has also declared that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum."  *Widmar v. Vincent*, 454 U.S. 263, 268 n.5 (1981).  The Court must therefore analyze each piece of the University's property to which the student speakers seek access rather than simply the campus as a whole.  *See Cornelius*, 473 U.S. at 801.

In determining the nature of the forum, courts look to the traditional use of the property, the objective use and purposes of the space, the government intent and policy with respect to the property, and its physical characteristics and location.  *Id.* at 802; *Bowman v. White*, 444 F.3d 967, 978 (8th Cir. 2006).

Plaintiffs assert that the northwest corner of McMicken Commons, designated by the University as the "Free Speech Area," constitutes a traditional public forum.  (Doc. 43

at 11).  The Defendants contend that it, along with all other campus areas, is a limited
public forum.  (Doc. 44 at 16).

 The Free Speech Area is a grassy open space between slant walks measuring
approximately 4,537 square feet on the University's West Campus.  (Doc. 62, Ex. 1 at 3).
It comprises approximately .01% of the entire campus.  (Doc. 15 at ¶ 37).  The
University contends that the area is a limited public forum.

 While the policy establishes the University's <u>subjective</u> intent to make the open
campus areas limited public fora and to restrict access to outsiders, the <u>objective</u> criteria
demonstrate that the University has traditionally made the Free Speech Area available to
students as a designated public forum.  The University's Use of Facilities Policy Manual
declares that the northwest corner of McMicken Commons is "designated as the main free
speech area" and that "demonstrations, picketing and rallies" may take place only in that
area.  (Doc. 15, Ex. A at 14).  Further, it is the policy of the University that "if a request is
made in compliance with the notice requirement and for a University location available to
the expressive activity, the request is to be honored."  (Doc. 43, Ex. 1 at 7).

 Because the property has traditionally been open for speech and debate by
students, and because the University grants students access to the Free Speech Area as a
matter of course, the University has made the Free Speech Area a designated public
forum as to students.  *See Perry*, 460 U.S. at 48 (holding that evidence that access to the
forum was granted as a matter of course would establish the creation of a public forum).

In seeking to avoid this finding by the Court, Defendants rely on the Sixth

Circuit's decision in *Gilles v. Garland* to support their proposition that open areas on

public university campuses are limited public fora.  (*See* Doc. 44 at 14 (citing 281 Fed.

App'x 501, 511 (6th Cir. 2008))).  In *Gilles,* the court upheld the right of Miami

University to designate its open campus areas as a limited public forum with respect to an

outside evangelist who sought to preach on campus.  *Gilles*, 281 Fed. App'x at 511.

However, recent decisions by the Supreme Court and the Sixth Circuit call into question

whether *Gilles* is still valid authority.  The *Gilles* court treated the terms "limited public

forum" and "designated public forum" interchangeably.  *See Gilles*, 281 Fed. App'x at

509 ("The second type of forum has been alternatively described as a "limited public

forum," ... and as a "designated public forum.""").  But the Supreme Court has

subsequently clarified that <u>designated public fora and limited public fora are distinct</u>

<u>types, subject to differing standards of scrutiny</u>.  *See Pleasant Grove City, Utah v.*

*Summum*, 555 U.S. 460, 469 (2009).  This *Pleasant Grove* decision "resolves the

confusion over terminology and scrutiny levels" created by the Sixth Circuit's earlier

decisions, and diminishes the value of *Gilles*' holding that open campus spaces of public

universities are limited public fora.  *Miller*, 622 F.3d at 535, n.1.  Indeed, the Sixth

Circuit's most recent decision on the matter holds that such spaces are more appropriately

considered designated public fora.  *See McGlone v. Bell*, --F.3d.--, 2012 WL 1403233,

*11 (6th Cir. Apr. 23, 2012) (holding that the open areas of Tennessee Technical

University's campus are designated public fora); *see also Hays Cnty Guardian v. Supple*,

969 F.2d 111, 116 (5th Cir. 1992 (holding that the university campus is a designated public forum)).

Further, *Gilles* concerned the University's restriction of an external constituent who was unable to obtain sponsorship from a campus student organization. *Gilles*, 281 Fed. App'x at 502. *Gilles* does not suggest, nor is this Court aware of any other precedent establishing, that a public university may constitutionally designate its entire campus as a limited public forum <u>as applied to students</u>.

Defendants' view would allow the university to restrict the speech of all students to limited topics, subject only to a reasonableness review. Such a theory is an anathema to the nature of a university, which is "peculiarly the marketplace of ideas" and runs contrary to the Supreme Court's holding that "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy*, 408 U.S. at 180 (1972); *see also Pro-Life Cougars v. Univ. of Houston,* 259 F. Supp. 2d 575, 582 (S.D. Tex. 2003) (holding that the university and plaza "are public fora designated for student speech"); *Univ. and Cmty. Coll. Sys. of Nev. v. Nev. for Sound Gov't,* 100 P.3d 179, 190 (Nev. 2004) ("Typically, when reviewing restrictions placed on students' speech activities, courts have found university campuses to be designated public forums."). Accordingly, the Court determines that the Free Speech Area is a designated public forum with respect to the University's internal constituents.

In addition to the Free Speech Area, Plaintiffs seek access to outdoor spaces on the MainStreet area of campus.[2] (Doc. 43 at 12). "MainStreet is the pedestrian corridor" that runs through campus and "is the hub of campus activity." (Doc. 43, Ex. 3 at 2). The University now provides in its new policies that these areas "may be used for student speech if the University's reasonable notice requirements are met." (Doc. 42, Ex. 2 at 4). As with the Free Speech Area, "if a request is made in compliance with the notice requirement and for a University location available to the expressive activity, the request is to be honored." (Doc. 43, Ex. 1 at 7).

Therefore, the Court finds that by virtue of the University's opening of the above areas for student speech they became designated public fora as applied to students. *See Perry*, 460 U.S. at 48 (holding that evidence that access to the forum was granted as a matter of course would establish the creation of a public forum).

Plaintiff also asks the Court to rule that otherwise undesignated University streets, sidewalks, and open areas are also designated public fora as to students. (Doc. 43 at 17). In response, the Court finds that while the University may exclude those without a legitimate purpose from interior sidewalks and public exterior spaces, <u>such locations remain designated public fora as to students</u>. *Justice For All v. Faulkner*, 410 F.3d 760,

---

[2] These spaces include the Tangeman University Center Plaza, Bearcat Pavilion, Bearcat Plaza, McMicken Free Speech Area, McMicken Commons, Sigma Sigma Commons, Campus Green, Campus Recreation Center West Plaza, and Campus Recreation Center East Plaza. (Doc. 43 at 12; Doc. 43, Ex. 3 at 4).

769 (5th Cir. 2005) ("[O]utdoor areas of [a university's] campus generally accessible to students such as plazas and sidewalks" are "public forums for student speech.").

Speech restrictions in both traditional and designated public fora, *i.e.*, here, the Free Speech Area and the campus open areas, plazas and sidewalks, are subject to strict scrutiny, and the government may only exclude a speaker if necessary to serve a compelling government interest and only if the exclusion is narrowly drawn to achieve that interest. *Miller*, 622 F.3d at 534. However, the "government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Plaintiffs assert that the University's notice policy is overbroad and serves as an impermissible prior restraint. (Doc. 43 at 36). A prior restraint is any government restriction that vests an administrative official with discretionary power to control in advance the use of public places for First Amendment Activities. *Kunz v. People of the State of N.Y.*, 340 U.S. 290, 293-294. Prior restraints bear a heavy burden of unconstitutionality. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 225 (1990). To pass constitutional muster, a permitting scheme must leave relatively little discretion in the hands of public officials regarding whether to grant or deny a permit. *Id.* at 225-226.

Here, the mere fact that the notice requirement applies to <u>all</u> student speech raises constitutional concerns.  Under the terms of the University's original policy, students are required to give a minimum of five working days (and perhaps 10 working days) notice for any speech that is a "demonstration, picketing, or rally."  (Doc. 15, Ex. A at 15).  Yet, as stated at the outset:  "It is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so."  *Watchtower*, 536 U.S. at 165-66.  Such expansive permitting schemes place an objective burden on the exercise of free speech.  *Id*.  Further, they essentially ban spontaneous speech.  *Id*.

Here, while the "breadth and unprecedented nature of this regulation does not alone render [it] invalid," it is indicative of the University's failure to narrowly tailor the regulation to serve a compelling interest.  *Id.* at 166.  And in identifying a compelling interest, the University cannot simply assert interests that are important in the abstract.  *Turner Broad Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).  Mere speculation that speech would disrupt campus activities is insufficient because "undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression on a college campus."  *Healy*, 408 U.S. at 191.

The University asserts that it maintains the notice requirements to enable it to do what is necessary for activities to take place under peaceful and safe conditions.  (Doc. 42

-13-

at 25).[3]  Indeed there may be some speech, such as particularly large protests or rallies, that requires the University to take security or logistical steps to ensure the safety and order of campus.  But here the University does not restrict its regulation to large demonstrations, or those using sound amplification, or any number of potentially justifiable criteria.[4]  Rather, the University paints with a broad brush to encompass all speech that may be classified as a "demonstration, picket, or rally" and has failed to narrowly tailor its policy.  Such a restriction simply cannot be justified on the basis the University asserts.[5]

---

[3]  At least one other Ohio public university has been able to satisfy similar interests with nothing more than an anti-disruption policy.  *See Wright State Faculty Handbook*, Regulation of Time, Place and Manner ("Any individual or group may use, without prior notification, on any day of the week during daylight hours, any publicly accessible outdoor area of the University's Dayton and Lake campuses to collect signatures, distribute materials, and/or speak, as long as they do not disrupt the functioning of the University. Academic departments, programs and other units and registered student organizations may schedule University space to bring speakers and programs of their choice to the Dayton and Lake campuses on a space available basis. Such speakers shall have the same access to the University facilities as their sponsor. This Policy is not applicable to situations arising within the context of normal classroom instruction and discussion."), *available at* http://admit.wright.edu/academics/fhandbook/demo_march.html.

[4]  *See, e.g., Roberts v. Haragan*, 346 F. Supp. 2d 853, 870, n. 20 (N.D. Tex. 2004) (noting that a policy requiring prior notification for events "expected to draw a crowed of than 25 people would implicate a university's interests in controlling large gatherings that might disrupt classes, block building access, or create traffic hazards.  Permission for activities near intersections or during certain hours in close proximity to academic buildings might also be justified by a significant University interest in assuring safety or an environment conducive to study or teaching."); *Ward,* 491 U.S. at 801 (upholding a city's right to regulate sound amplification in a public forum).

[5]  The Court notes that while the original policy required prior notification for "demonstrations, picketing, and rallies," the new policy applies even more broadly, requiring a minimum of three working days for any "expressive activity," which the University defines as "any exercise of the right to free speech (*See* Doc. 44, Ex. 1 at 3-4).  Although a challenge to the terms of the University's revised policies is not yet before the Court, such a policy will not likely survive strict scrutiny.  It is simply unfathomable that a UC student needs to give the University advance notice of an intent to gather signature for a ballot initiative.  There is no danger to public order arising out students walking around campus with clipboards seeking signatures.

Therefore, the Court finds that Plaintiffs have established a significant likelihood of success on their claim that the University's requirement that all speakers give five to 15 days of advance notification to the University is facially unconstitutional.  The Use of Facilities Policy Manual additionally restricts all "demonstrations, picketing, and rallies" to the Free Speech Zone, without defining those terms.  (Doc. 15, Ex. A at 15).  Plaintiffs contend that the University has failed to provide a compelling interest justifying the exclusion of those activities from other designated public fora.  (Doc. 5 at 21).  In response, the University argues that the entire campus is a limited public forum, and that its location requirements are reasonable.  (Doc. 44 at 26).

However, the Court has determined that other open areas of campus constitute designated public fora, not limited public fora, and the University has simply offered no explanation of its compelling interest in restricting all demonstrations, rallies, and protests from all but one designated public forum on campus.  Consequently, the Court finds that Plaintiffs have established a significant likelihood of success on their claims that the University's location requirements unconstitutionally burden their right to free speech.

 Plaintiffs also allege that the University's original policies violate their right to due process because the policies were unconstitutionally vague and provided University officials with unbridled discretion in determining what constitutes a "demonstration, picket, or rally" subject to the requirement that they speak only in the Free Speech Area and comply with a lengthier notice requirement.  (Doc. 15 at 24).

-15-

In pursuing a void for vagueness claim, a plaintiff must establish that "a regulation's prohibitive terms are not clearly defined such that a reasonable person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *Miller*, 622 F.3d at 539 (internal citations omitted).  The doctrine ensures that laws provide "fair warning" of impermissible conduct and protect citizens against "impermissible delegation of basic policy matters for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*.  Consequently, a statute that fails to constrain an official's decision to limit speech with objective criteria is unconstitutionally vague.  *Id*.

In this case, the University's original policies impose a requirement that all "demonstrations, picketing, and rallies" may take place only in the Free Speech Area and must give a minimum of ten working days notice to the University Police, but the policies do not define those terms.[6]  (See Doc. 15, Ex. A at 15).  The University did not provide any written criteria for determining whether an expressive activity constitutes a demonstration, picket, or rally, and instead relied on University employees' "use of the word as it is commonly understood by persons of ordinary intelligence."  (Doc. 54 at 26). While the University contends that the solicitation of signatures does not fall into this definition, the Campus Scheduling employees who reviewed Morbitzer's request assigned him to the area designated for such speech.  The fact that the University and its own

_____

[6]  The Court notes that the University's newly revised policies do provide definitions for some of the challenged terms.  (*See* Doc. 44, Ex. 1).

employees have different understandings of the terms demonstrates the clear confusion arising from the unconstitutionally vague terms of the policies.

Plaintiffs further contend that the notice periods governing campus speech activity by students are also unconstitutionally vague.  The Use of Facilities Policy Manual requires "anyone requesting to demonstrate, picket or rally must give prior notice of ten (10) working days to University Police."  (*See* Doc. 15, Ex. A at 15).  The MainStreet Event guide, however, states that "all requests must be received no later than five business days before the requested date" and lists the Free Speech Area as a space subject to these regulations.  (*See* Doc. 43, Ex. 3 at 4, 11).  Further complicating matters, the Use of Facilities Policy Manual also requires ten days notice for speeches "requiring security," while the MainStreet Event Guide states that "[f]or events that require security and grounds, a minimum of 15 days before the requested date is required."  (Doc. 15, Ex. 1 at 12; Doc. 43, Ex. 3 at 11).  On their face, both policies purport to apply to the Free Speech Area, and yet impose different requirements.  Further, the policies provide no criteria for determining whether an event "requires security."

Because the original policy fails to provide criteria regarding what constitutes a "demonstration, rally, or picket" or an event "requiring security," imposes seemingly contradictory notice requirements, and presents university officials with the opportunity for arbitrary or discriminatory enforcement, the Court would be compelled to find the policy unconstitutionally vague on its face.

-17-

Thus, Plaintiffs have evidenced a substantial likelihood of success on the merits of their claims, the first requirement for issuance of a preliminary injunction.[7]

Moreover, it appears that there is little dispute on the remaining elements of the preliminary injunction test.  As Sixth Circuit has repeatedly held, "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Miller*, 622 F.3d at 540 (6th Cir. 2010); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989).  "When a constitutional violation is likely, moreover, the public interest militates in favor of injunctive relief because 'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Miller*, 622 F.3d at 540 (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).

Accordingly, Plaintiffs' Motion for a Preliminary Injunction (Doc. 5) is **GRANTED** in part.

## CONCLUSION

Defendants are hereby **ENJOINED** from:

(1)   Requiring prior notification for the solicitation by students of signatures of petitions;

(2)   Prohibiting all solicitation by students of signatures of petitions in any designated public forum, including the Free Speech Area, the outdoor spaces described in the MainStreet Event Guide, and campus sidewalks;

---

[7]   Because Plaintiffs have established a substantial likelihood of success on the merits, it also holds that Defendants have failed to establish that judgment should be granted in their favor as a matter of law.  Therefore, Defendants' Motion for Summary Judgment (Doc. 44) is **DENIED**.

(3)     Requiring that <u>all</u> student "demonstrations, picketing, or rallies" occur only in the Free Speech Area and/or McMicken Commons and Northwest McMicken Commons;

(4)     Requiring five to 15 days prior notification for any and <u>all</u> student "demonstrations, picketing, or rallies" – without differentiations;

(5)     Imposing or enforcing any policy restricting student speech in any designated public forum, including the Free Speech Area, the outdoor spaces described in the MainStreet Event Guide, and campus sidewalks, that is not individually and narrowly tailored to serve a compelling University interest.

Defendants shall revise the student speech policies to craft more narrowly tailored regulations that regulate student expressive activities in designated public fora only as are necessary to serve a compelling government interest; and Defendants may impose content-neutral time, place, or manner restrictions in such a way so as not to burden substantially more speech than is necessary to serve a compelling University interest.

**IT IS SO ORDERED.**

Date:  June 12, 2012                                    _s/ Timothy S. Black_
                                                        Timothy S. Black
                                                        United States District Judge